## HALL v. UNION LIGHT, HEAT & POWER CO.

### No. 137.

District Court, E. D. Kentucky, Covington Division.

Feb. 21, 1944.

J. Garvey Davis, of Newport, Ky., for plaintiff.

Galvin, Tracy, Crawford, Geoghegan & Levy, of Cincinnati, Ohio, for defendant.

SWINFORD, District Judge.

This case is before me on the defendant's motion to dismiss the complaint.

The plaintiff was employed by the defendant on December 23, 1933 and continued in its service as a regular employee until February 7, 1938. On that date, due to illness, the employment ceased. The plaintiff was re-employed by the defendant the following May (1938) and continued in the employ of the defendant until April 25, 1942, at which time he was inducted into the United States Army under the provisions of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq. On June 4, 1942 he was honorably discharged from the United States Army. He reported immediately, on June 7, 1942, to the defendant company and demanded that he be restored and employed in the same position, for the same compensation, as that which he had with the defendant previous to his induction into the Army. The defendant refused to re-employ him until September 28, 1942. He now brings this action to recover from the defendant the sum of $512, which is the amount he would have earned had he been employed at the time he first made application up until the time when he was actually employed.

He alleges that the jurisdiction of this court is based upon the Act of Congress known as the Selective Training and Service Act of 1940 and the Selective Training and Service Act of 1940, as amended, Public Law 360, 77th Congress, 55 Stat. 844.

The Act provides that any person inducted into the Army who has been honorably discharged and who has left a position other than a temporary position, is physically fit, is still qualified to perform the duties of such position, and makes application for re-employment within forty days after his release from military service, shall be restored to his former position. I quote the section involved, Section 8, Subsec-

tion (b), Paragraph (B), 50 U.S.C.A.Appendix, § 308(b) (B): "(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so."

Subsection (e) provides as follows: "(e) In case any private employer fails or refuses to comply with the provisions of subsection (b) or subsection (c), the district court of the United States for the district in which such private employer maintains a place of business shall have power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, to specifically require such employer to comply with such provisions, and, as an incident thereto, to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action."

The defendant, for the purpose of the motion, admits the facts set forth in the complaint but takes the position that the Act is not applicable for two reasons. First, that the court has no jurisdiction to entertain an independent action to recover wages or salary; that such recovery can only be incident to the recovery of the employment or position. Second, that Section 8 of the Act, 50 U.S.C.A.Appendix, § 308(b) (B), is in violation of the defendant's rights under the Fifth Amendment of the Constitution of the United States. I will take these questions up in the order named.

In determining the question of the court's jurisdiction as set forth in a statute it is necessary to look at the whole statute and to examine it in its entire context to ascertain the purpose which Congress had in mind in its enactment and in the fixing of the jurisdiction to which designated persons might look to enforce their remedy. I cannot conclude that this question can be narrowed down to the technical definition of the word, "incident." It may be accepted as a fact that the word "incident" when used in its ordinary and reasonable sense implies that it is related to some major thing. That to recover wages, as in the case at bar, would usually be in connection with and incidental to an action brought to recover the position or employment.

However, to deny recovery except in such a case and to decline to permit the plaintiff here to prosecute this cause on such a narrow construction would be to place in the hands of the employer the means through which it could defeat the whole purpose of the Act and to make a mockery of what the Congress had in mind in its passage. The whole context of the statute and the purpose for which it became the law was to minimize, in so far as possible, the sacrifices of those who were required to enter the military service by assuring them that their jobs, their pay and their status with their employers would be held inviolate and secured to them in order that they might return to the status quo if they made application within forty days after they severed their connection with the military forces. The Act uses the language that they shall be considered as having been on furlough or leave of absence during the period of training and service. To confine the right to recover wages only to the cases in which the ex-service man is required to go into court to recover his employment is making a distinction without a difference. The same reasoning applies to both cases and whether the employment was established immediately upon his return or after some weeks or months it is the whole purpose and spirit of the Act in the light of a reasonable construction of the language used to put him in the identical position he was before he entered the military service.

Neither do I think that the Act is unconstitutional as repugnant to the guarantees in the Fifth and Sixth Amendments of the Constitution, because of the provision that the employee shall be restored to his former position and status "unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so." The defendant takes the position that the terms, "impossible" and "unreasonable" are so vague and uncertain that it cannot be complied with; that its violation, whether wilful or inadvertent, is not specifically defined and must be left to the determination of judges or juries without fixing standards ascertainable in its application. It must be borne in mind that while the country was not at war at the time this statute was enacted its purpose was for the general welfare and preparation for any eventuality. No rule of statutory construction is more readily

applied by the courts than that public statutes dealing with the welfare of the whole people are to have a liberal construction. The general rule that legislators, as well as judges, must obey and support the constitution and have weighed the constitutional validity of every act they pass, giving to each statute the presumption of constitutionality, is of itself sufficient reason to sustain the validity of the act in question. I strongly adhere to the rule that every reasonable doubt must be resolved in favor of a statute and not against it and that it should not be adjudged invalid unless its violation of the constitution is clear, complete, and unmistakable. Fletcher v. Peck, 6 Cranch 87, 3 L.Ed. 162; Interstate, etc., R. Co. v. Massachusetts, 207 U.S. 79–88, 2 S.Ct. 26, 52 L.Ed. 111, 12 Ann.Cas. 555; Logan & Bryan v. Postal Telegraph, etc., Co., C.C., 157 F. 570; Spain v. St. Louis & S. F. R. Co., C.C., 151 F. 522.

In the comparatively recent case of Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, the Supreme Court emphasized this rule and reaffirmed the proposition that the legislator is primarily the judge of the necessity of statutory law and every possible presumption is in favor of its validity, and though the court may think the enactment unwise, it may not be annulled unless palpably in excess of legislative power.

The statute here involved not only has the presumption of constitutionality as a general proposition but carries the added sanctity of its stated purpose, "to strengthen the common defense," etc. 50 U.S.C.A. Appendix, § 308(d).

In the case of Sweetser v. Emerson, 236 F. 161, 162, Ann.Cas.1917B, 244, the Circuit Court of Appeals, First Circuit, had under consideration the construction of the National Defense Act of June 3, 1916. In the opinion the court used this language:

"While certain conditions justify rules of technical and strict construction, the particular situation here makes the question more one of interpretation, to be influenced and controlled by the broad and important inquiry whether, under the National Defense Act of June 3, 1916, the purpose of Congress was to weaken or strengthen the federal military arm; and an ascertainment of that character necessarily involves grave consideration of questions of public and private rights and of public policy as well.

"It is quite likely, if the questions as to these statutes were to be determined under rules of strict and literal construction, that the conclusion reached by the learned judge of the District Court upon careful reasoning, would be quite justifiable; but we are not concerned with that view, because we think that a public statute of this character, which relates to the vital question whether the military power of the government shall be potential and effective in the hands of the constitutional authorities, or is to be contingent upon the option of constituent members of the lawful military organizations, is one to be determined under broad rules of liberal construction."

I cannot lose sight of the fact that the Act under consideration in the instant case, with its provision for reasonable assurance of employment after the expiration of the required military service, is a significant force in the maintenance of the morale of our military forces on which depends to an inestimable extent the success of our cause and the consequent security of the whole people, their government and country. To now strike down this Act of the legislative branch of the government because it necessarily employs language and terms of a more or less indefinite and negative meaning would be an unwarranted usurpation of the legislative function of providing for the common defense. Especially so when the statute in question is not a criminal statute and when the terms used are not so vague or indefinite as not to be reasonably understood by reasonable people.

The Supreme Court in the case of Home Building & Loan Ass'n v. Blaisdell et al., 290 U.S. 398, on page 426, 54 S.Ct. 231, on page 235, 78 L.Ed. 413, 88 A.L.R. 1481, is, in this respect, significant: "While emergency does not create power, emergency may furnish the occasion for the exercise of power. 'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.' Wilson v. New, 243 U.S. 332, 348, 37 S.Ct. 298, 302, 61 L.Ed. 755, L.R.A.1917E, 938, Ann.Cas.1918A, 1024. The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. Thus, the war power of the federal government is not created by

the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation."

The meaning of these terms is not obscure and as suggested in the case of United States v. Ragen, 314 U.S. 513, on page .524, 62 S.Ct. 374, on page 379, 86 L.Ed. 383, "On no construction can the statutory provisions here involved become a trap for those who act in good faith. A mind intent upon willful evasion is inconsistent with surprised innocence."

The suggestion that the language used gives no guidance either to litigants, courts or juries, but must be left to the determination of judges and juries in each respective case is not a valid argument. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

In the case of International Harvester Co. v. Kentucky, 234 U.S. 216, 34 S.Ct. 853, 855, 58 L.Ed. 1284, the court said: "We regard this decision as consistent with Nash v. United States, 229 U.S. 373, 377, 33 S. Ct. 780, 57 L.Ed. 1232, 1235, in which it was held that a criminal law is not unconstitutional merely because it throws upon men the risk of rightly estimating a matter of degree,—what is an undue restraint of trade. That deals with the actual, not with an imaginary condition other than the facts. It goes no further than to recognize that, as with negligence, between the two extremes of the obviously illegal and the plainly lawful there is a gradual approach, and that the complexity of life makes it impossible to draw a line in advance without an artificial simplification that would be unjust. The conditions are as permanent as anything human, and a great body of precedents on the civil side, coupled with familiar practice, makes it comparatively easy for common sense to keep to what is safe."

I do not find sufficient analogy between the case before me and United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 300, 65 L.Ed. 516, 14 A.L.R. 1045, to destroy this statute as being too vague to meet the requirements of our Constitution. The Cohen case was a criminal prosecution under the Lever Act (Act of October 22, 1919, c. 80, § 2, 41 Stat. 297, 298, amending 4 of Act of August 10, 1917, c. 53, 40 Stat. 276, 277). The defendant was indicted on two counts charging that it did "wilfully and feloniously make an unjust and unreasonable rate and charge in handling and dealing in a certain necessary, to wit, sugar", in that it demanded, exacted and collected excessive prices for sugar purchased from it. The Supreme Court held this section of the Act unconstitutional because the terms, "unjust or unreasonable" were vague, indefinite and uncertain and the Act fixed no immutable standard of guilt but left such standard to the variant views of the different courts and juries which might be called upon to enforce it, and because it did not inform the defendant of the nature and cause of the action against him; that Congress alone had the power to define crimes against the United States and that this could not be delegated to the courts or juries of the country. As pointed out by counsel, on the strength of the case of Standard Chemicals & Metals Corp. v. Waugh Chemical Corp., 231 N.Y. 51, 131 N.E. 566, 14 A.L.R. 1054, the rule might be applied as affecting rights in a civil case as well as in a criminal case. Nevertheless, the reason for the rule is certainly not as obvious in a civil responsibility as it would be in a criminal charge. There is a vast difference between a person answering an indictment which makes the general charge that he has been guilty of an unjust and unreasonable act and in a civil action in which the question for determination either by a court as trier of the law and facts or a jury under proper instructions from the court, in determining whether or not a certain person or corporation had had such a change in his or its circumstances as to make it impossible or unreasonable to re-employ an ex-service man. The case of Miller v. Strahl, 239 U. S. 426, 36 S.Ct. 147, 149, 60 L.Ed. 364, involved the determination of the constitutionality of a statute of the State of Nebraska fixing the care which the operator of a hotel owed to his guests. The statute required, among other things, that the operator of the hotel and his employees were "to do all in their power to save such guests and inmates." Rev.St.1913, § 3104. The statute was held constitutional and the court in its opinion said:

"Plaintiff in error contends further that the statute 'is lacking in due process of law' because 'it fails to prescribe any fixed rule of conduct.' The argument is that the requirement 'to do all in one's power' fails to inform a man of ordinary intelligence what he must or must not do under given circumstances.

"Rules of conduct must necessarily be expressed in general terms and depend for their application upon circumstances, and circumstances vary. It may be true, as counsel says, that 'men are differently constituted,' some being 'abject cowards, and few only are real heroes;' that the brains of some people work 'rapidly and normally in the face of danger while other people lose all control over their actions.' It is manifest that rules could not be prescribed to meet these varying qualities. Yet all must be brought to judgment. And what better test could be devised than the doing of 'all in one's power' as determined by the circumstances."

As pointed out in the recent case of Coplin v. United States, 9 Cir., 88 F.2d 652, 657, certiorari denied 301 U.S. 703, 57 S. Ct. 929, 81 L.Ed. 1357, with reference to the point of general terms in Sec. 17(q) in the Federal Securities Act of 1933, 15 U.S.C.A. § 77q, "its provisions, while perhaps falling short of the standards of immutability followed by the laws of the Medes and the Persions, are definite enough according to the canons of Anglo-American law."

I do not believe the Act in question here is unconstitutional and an order overruling the motion to dismiss the complaint is this day entered.