**UNITED STATES v. WEISS.**

**Cr. No. 40621.**

District Court, E. D. New York.

April 2, 1946.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y., and Anthony G. Greco and James D. Saver, Asst. U. S. Attys., both of Brooklyn, N. Y., for plaintiff.

Joseph Leary Delaney, of New York City, for defendant.

MOSCOWITZ, District Judge.

Defendant was tried before the Court, having waived a jury, upon the second count of an indictment charging him with violation of Section 311, Title 50, Appendix, United States Code Annotated, which, insofar as pertinent, provides: "Any person * * * who * * * evades * * * service in the land or naval forces or any of the requirements of this Act * * * or who in any manner shall knowingly fail or neglect to perform any duty required of him under * * * this Act, or rules or regulations made pursuant to this Act * * * shall, upon conviction * * *" etc. Regulation 626.1(b), conceded to have been "made pursuant" to the Act, at the time in question provided: "Each classified registrant shall, within 10 days after it occurs, * * * report to the local board in writing any fact that might result in such

registrant being placed in a different classification."[1]

The indictment charges that defendant, being a person duly registered under the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 301 et seq., violated the aforementioned statute and regulation in that he "did unlawfully, wilfully and knowingly omit and refrain from disclosing to the Local Board duly exercising jurisdiction of defendant, Meyer Weiss, facts as to the liability of said defendant, Meyer Weiss, for service under the provisions of the Selective Training and Service Act," that is to say, that he "wilfully, knowingly and deliberately omitted and refrained from disclosing to the Local Board duly exercising jurisdiction in that behalf, the fact that said defendant, Meyer Weiss, was not from June 3, 1944 to December 31, 1944 employed by the Universal Camera Corporation, and that the employment of said Meyer Weiss had terminated on or about June 3, 1944. * * *"

Defendant asserts three principal arguments: (1) That the language of regulation 626.1(b) is too vague, indefinite and uncertain to inform those subject to it what conduct on their part will render them liable to the criminal penalty imposed, upon the basis of which a motion is made to dismiss the indictment, (2) that even if the regulation be deemed to furnish a legal standard of guilt, the indictment does not charge a crime thereunder, and (3) that even if a crime be charged, the evidence proves that defendant is not guilty thereof. No testimony was offered at the trial before the Court, the parties having stipulated various facts and exhibits having been introduced as the only other evidence. After the trial was completed, the Court summoned counsel for the defendant and the Assistant United States Attorney and advised defendant's counsel that in view of the seriousness of the crime charged, if his client would desire a jury trial, the Court would permit withdrawal of the earlier waiver and would grant the defendant the right to have a jury pass upon the question of his guilt or innocence. By letter dated February 21, 1946, which has been added to the file in this case, counsel informed the Court that defendant continued in his original position and did not desire to go before a jury.

On October 16, 1940, the defendant registered under the provisions of the Selective Training and Service Act and in due course shortly thereafter was placed in Class 3–A, as a pre-Pearl Harbor father. The intensity of the war having brought about a change of Selective Service policy whereby pre-Pearl Harbor fathers were no longer to be deferred unless they were engaged in an essential occupation, on September 4, 1943, defendant's Local Board wrote to him as follows:

"Pursuant to Local Board memorandum No. 181 issued by Selective Service, as amended August 16, 1943, please be advised that an examination of your file indicates that your present occupation is non-deferable.

"You must, therefore, transfer to some other position or register with the United States Employment Service in order to be transferred to other employment.

"This Board grants you 30 days' time from date in which to comply with the above, otherwise we shall reclassify you to 1A for induction in accordance with Selective Service regulations."

On September 13, 1943, defendant procured employment and commenced work as a supervisor trainee at the Universal Camera Corporation, working regularly on the 3:30 to midnight shift after a two-weeks training period. The fact of defendant's employment there and that the production being carried on was critical work for the army and navy were communicated by the Universal Camera Corporation to defend-

---

[1] This provision is drawn to the registrant's attention by a notation at the bottom of the classification card which is sent to him (Form 57), which was received by this defendant, stating: "The law requires you, 1: To keep in touch with your local board. 2: To notify it of any change of address. 3: To notify it of any fact which might change your classification." Regulation 605.51 provides that any forms sent to registrants and any instructions thereon are given the force and effect of regulations.

ant's Local Board by letter dated September 14, 1943. On September 18, 1943, the Local Board wrote to the defendant that they had read the letter from Universal Camera Corporation and that "in view of same" defendant would be continued in Class 3–A.

Six months later, on March 30, 1944, defendant received notice from the Local Board that he had been placed in Class 1–A, which meant that he was considered available for military service. Various occupational classification and certification forms, designated as 42–A and 42–B were submitted to the Local Board by Universal Camera Corporation, the last on May 22, 1944, which pointed to the 100% critical work in which the firm was engaged for the navy and stated that defendant was "employed full time" as "Supervisor of Sealing Division," enumerating his duties and that it would take over six months to replace him. On July 5, 1944, the Local Board placed the defendant in Class 2–B, which classification entitled him to deferment from induction because of the character of his employment.

In the meantime, work having slackened at Universal Camera Corporation, defendant applied for a vacation and was told by the Supervisor that if he obtained a doctor's certificate he could have a leave of absence until the resumption of work required his return. Defendant procured a letter from a doctor and ceased work on June 3, 1944. On a printed form in the corporation's files, entitled "Notice of Termination of Employment," appears the handwritten notation "leave of absence, ill health, see doctor's letter in file." The official who signed this form did not recall whether it contained the handwritten words when he signed it but in the absence of any proof to that effect, the Court cannot assume that the paper has been tampered with. Defendant did not physically return to work for Universal Camera Corporation at any time after June 3, 1944, and received no pay whatever after that date. These facts were not made known to the Local Board until defendant wrote a letter setting them forth on December 26, 1944, which was after an investigation had been started and he had been interrogated by an official at Selective Service headquarters.

■■ It is a fundamental constitutional protection that a penal statute must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties. From the great number of decisions passing upon the question whether particular legislative enactments are wanting in the required certainty, it is apparent that any test of validity is difficult of delineation. To the extent that any consistency may be evolved, it appears that a statute which forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the constitutional guaranty of due process of law. United States v. L. Cohen Grocery Co., 1921, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; Connally v. General Const. Co., 1925, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; Lanzetta v. New Jersey, 1939, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888.

Thus, in the Cohen Grocery case, supra, the portion of the Lever Act, 41 Stat. 297, § 2, which outlawed the making of "any unjust or unreasonable * * * charge * * * for any necessaries" was condemned because it left open "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against" and because an "attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury" (page 89 of 255 U.S., 41 S.Ct. 300, 65 L.Ed. 516, 14 A.L.R. 1045). In the Connally case, supra, an Oklahoma statute imposed penalties upon a contractor who failed to pay his employee "not less than the current rate of per diem wages in the locality where the work is performed." 61 Okl.St.Ann. § 3. It was held that the statute was so equivocal in two respects that a person of common intelligence attempting in the best of faith to comply

with the terms of the statute, could not, without gifts which mankind does not possess, be sure that he was obeying its dictates and the statute was held invalid as being too vague and indefinite. The Court pointed out that no one could say with any accuracy what area constituted the "locality" of the work and a "current rate of wages" imported a range out of which it would be impossible safely to select a proper amount to be paid. In the Lanzetta case, supra, an enactment of New Jersey inflicting severe punishment upon a person who was "a member of any gang" was held invalid on the finding by the court that nowhere in the language of the law was the term "gang" defined and that the meanings indicated in dictionaries and in historical and sociological writings were numerous and varied. For the reason that ordinary persons could not understand what was condemned under this and other ambiguous terms, the statute was held repugnant to the due process clause.

But it is plain that the statute here involved and Regulation 626.1(b) made pursuant thereto are not open to the same criticism as were the enactments in these cases. An almost identical requirement formed part of the draft legislation in World War I[2] and registrants have been educated through two wars in what facts may result in a change of their classification. The language of the Regulation certainly has acquired a well understood connotation and men of ordinary intelligence would not be likely to differ as to its meaning. All registrants may be presumed to be aware that deferments from military service are based upon physical condition, marital and dependency status and occupation and that termination of an employment, upon the sole basis of which a registrant has been given a classification defined in the Regulations and entitling him to deferment, may result in a change of that classification. Here the evidence clearly demonstrates that this defendant, who is a lawyer, not only knew that he was placed in Class 2–B solely because of

his employment with Universal Camera Corporation but that he originally undertook the employment as a mere subterfuge and for the purpose of avoiding induction.

In Gorin v. United States, 1941, 312 U. S. 19, 61 S.Ct. 429, 434, 85 L.Ed. 488, the constitutionality of the Espionage Act, 50 U.S.C.A. § 31 et seq., was sustained though it prohibited the obtaining of documents and disclosure of information "connected with the national defense" on the ground that "the use of the words 'national defense' has given them, as here employed, a well understood connotation." In Dunne v. United States, 8 Cir., 1943, 138 F.2d 137, 142, in rejecting the argument that the wording of the contested statute was too vague and sweeping ("advocate, abet, advise or teach the duty, necessity, desirability or propriety" of overthrowing the government, 18 U.S.C.A. § 10), the court said (at page 142): "The words attacked are ordinary everyday terms with generally understood meanings. They are not vague. They are 'sweeping' only in the sense that they endeavor to cover the different means by which Congress deemed the forbidden result might be brought about." In Chaplinsky v. New Hampshire, 1942, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, the Court held that a statute was not vague or indefinite which provided that "No person shall address any offensive, derisive or annoying words to any other person * * *", Pub.Laws N.H.1926, c. 378, § 2, saying (at page 573 of 315 U.S., 62 S.Ct. 770, 86 L.Ed. 1031) "The word 'offensive' is not to be defined in terms of what a particular addressee thinks. * * * The test is what men of common intelligence would understand * * *."

It is apparent that legislation must often be adapted to conditions involving details which it would be impracticable to enumerate—and the law does not require that it be done. Rules of conduct must necessarily be expressed in general terms and depend for their application upon circumstances, which vary. Miller v. Strahl, 1915, 239 U.S. 426, 36 S.Ct. 147, 60 L.Ed. 364, sustaining a

---

[2] Section 116 of the Second Edition of the Regulations under the Selective Service Act of 1917, provided: "Every registrant shall, within five days after the happening thereof, report to his Local Board any facts which might change or affect his classification."

560

statute which required operators of hotels in case of fire "to do all in their power to save such guests and inmates." Rev.St.Neb.1913, § 3104. In Robinson v. United States, 1945, 324 U.S. 282, 65 S.Ct. 666, a provision in the Federal Kidnapping Act, 18 U.S.C.A. § 408a et seq., concerning the death penalty was challenged because of the uncertainty as to the precise meaning of the word "unharmed." The Court said, 324 U.S. at p. 286, 65 S.Ct. at page 668: "In most English words and phrases there lurk uncertainties. * * * This purpose to authorize a death penalty is clear even though Congress did not unmistakably mark some boundary between a pin prick and a permanently mutilated body." The Court went on to say that it had no "power wholly to nullify the clearly expressed purpose of Congress * * * because of a doubt as to the precise congressional purpose in regard to hypothetical cases that may never arise."

It would be nigh impossible to enumerate the myriad of facts which might affect a man's liability for service or result in a change of classification. However, the statute provides punishment only for those who knowingly evade service or neglect to perform a duty required of them. "A mind intent upon willful evasion is inconsistent with surprised innocence." United States v. Ragan, infra. There are many instances where a man's fate depends on his estimating correctly some matter of degree in the conduct required of him. Nash v. United States, 1913, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232. In United States v. Ragan, 1942, 314 U.S. 513, at page 523, 62 S.Ct. 374, 378, 86 L.Ed. 383, the Court stated: "The mere fact that a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct." In this case the court upheld the constitutionality of a section of the Revenue Act which provided that "Any person who wilfully attempts in any manner to evade or defeat any tax * * * shall * * * be guilty of a felony", Revenue Act 1932, § 145, 26 U.S.C.A. Int.Rev.Code, § 145,

against the contention that the statute left to the trier of the facts the responsibility for fixing the standard by which the defendant's guilt would be determined, which might vary according to the views of different courts or juries. The Court stated that the acts of bad faith which are punishable under the statute "are not beyond the ready comprehension either of persons affected by the act or of juries called upon to determine violations" and that "On no construction can the statutory provisions here involved become a trap for those who act in good faith. A mind intent upon willful evasion is inconsistent with surprised innocence." 314 U.S. at page 524, 62 S.Ct. at page 379. In Omaechevarria v. Idaho, 1918, 246 U.S. 343, at page 348, 38 S.Ct. 323, at page 325, 62 L. Ed. 763, where the word "range" was challenged in a statute which prohibited the pasturing of cattle on certain ranges, Rev.Codes Idaho, § 6872, the Court said: "Men familiar with range conditions and desirous of observing the law will have little difficulty in determining what is prohibited by it." Justice Holmes, in the case of United States v. Alford, 1927, 274 U.S. 264, at page 267, 47 S.Ct. 597, 598, 71 L.Ed. 1040, in holding a statute not indefinite which prohibited the building of a fire "near" a forest, 18 U.S.C.A. § 107, said: "Taken in connection with the danger to be prevented it lays down a plain enough rule of conduct for anyone who seeks to obey the law." The public interest in the object of the Selective Service Regulations is obvious.

Statutes challenged as indefinite have also been upheld in the following cases: Lloyd v. Dollison, 1904, 194 U.S. 445, 24 S.Ct. 703, 48 L.Ed. 1062, 1063; Waters-Pierce Oil Co. v. Texas, 1909, 212 U.S. 86, 29 S.Ct. 220, 53 L.Ed. 417; Hygrade Provision Co. v. Sherman, 1925, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402; Miller v. Oregon, 1927, 273 U.S. 657, 47 S.Ct. 344, 71 L.Ed. 825; United States v. Wurzbach, 1930, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508; United States v. Shrevesport Grain & Elevator Co., 1932, 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175; Kay v. United States, 1938, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607;

United States v. Henderson, 1941, 73 App. D.C. 369, 121 F.2d 75; Bell v. Regents, 295 N.Y. 717, 65 N.E.2d 426.

In Hall v. Union Light, Heat & Power Co., D.C.,Ky.1944, 53 F.Supp. 817, the re-employment provisions of the Selective Training and Service Act were challenged as unconstitutionally vague and indefinite because an exception to the obligations was permitted where the employer's circumstances made the requirements "impossible or unreasonable" of application. The court rejected the contention, pointing to the broad purpose of Congress in adopting the legislation to provide for the common defense of all the people and the often applied rule that such enactments should be liberally construed to sustain their validity. United States v. Lambert, 3 Cir., 1941, 123 F.2d 395. The words used were held to be understood by reasonable people.

■ Although it existed during two wars, it is significant that not until last year was Regulation 626.1(b) or its predecessor ever challenged. The case of Stassi v. United States, 5 Cir. 1945, 152 F.2d 581, is the only decision cited upon the matter in issue. There the charge was substantially the same as here but the facts were stronger for the defendant, since he was only "chronically absent" during a five months' period from the employment on the basis of which he had received a deferred classification, whereas here the defendant never returned at all during the six months covered by the indictment nor thereafter. The court affirmed a verdict of guilty and expressed the view that Regulation 626.1(b) afforded an ascertainable standard of guilt and was constitutional, although it based its decision upon the holding that the indictment sufficiently charged an offense under Section 311 of Title 50, United States Code Annotated. The indictment in the case at bar equally states an offense under Section 311, aside from Regulation 626.1(b). A registrant who wilfully, knowingly and deliberately failed to disclose to the Local Board that the essential employment had terminated which he had taken especially to procure a deferment from service in the armed forces and solely upon the basis of which

he had been granted such deferment, is guilty of evading service, which the statute makes a crime.

■ He would also be guilty of knowingly failing and neglecting to perform a duty of him required under the Regulations, to wit, Regulation 626.1(b). The language of Regulation 626.1(b) is not so vague and indefinite that no standard of guilt is furnished to persons of integrity interested in obeying it. The purpose of the Regulation to require the disclosure by the registrant to the Local Board of any facts which might alter his classification is obvious. Since the legislation is designed for the general welfare of the whole public in an emergency period, its object should not be lightly thwarted by a strained interpretation. Hypothetical situations which may never arise, such as those suggested by the defendant, can play no part in appraising the sufficiency of the enactment. "The rule * * * that criminal statutes must be strictly construed does not require that the words of an enactment be given their narrowest meaning or that the lawmaker's evident intent be disregarded." United States v. Giles, 1937, 300 U.S. 41, 48, 57 S.Ct. 340, 344, 81 L.Ed. 493, citing United States v. Corbett, 1909, 215 U.S. 233, 242, 30 S.Ct. 81, 54 L.Ed. 173. See also Robinson v. United States, supra. Men of common intelligence, desirous of observing the law, would have no difficulty in agreeing upon the requirements of Regulation 626.1(b). Through two wars it has become universally known that draft classification depends upon physical condition, marital and dependency status and occupation. The various classifications, into one of which a person with a particular status may be placed, are enumerated and defined in the Regulations. At the time herein involved, a person who was employed in an occupation essential to the war effort was eligible for Class 2–B. A registrant who was given such a classification may be presumed to know that it depended solely upon the employment and its continuance and that a termination of such employment is a fact which might result in a change of classification. Regulation 626.1(b).

makes it the registrant's duty to report this fact to his Local Board within ten days of its occurrence. Knowingly failing to perform that duty is made a crime by the statute.

█ The question remains whether the defendant, having failed to perform that duty, did so with the scienter which is the statutory element embodied in the word "knowingly". Upon this point, the court entertains no reasonable doubt whatever that the defendant is guilty. He may be presumed to have been possessed of more than the common intelligence under which standard men are held accountable for their illegal conduct; he was a lawyer. He was given direct notice by the Local Board in its letter of September 4, 1943, to him that the activities in which he was then engaged were not considered essential and that unless he procured employment in a war industry he would be placed in Class 1-A. A few days later he procured the job on the night shift of Universal Camera Corporation for the purpose of avoiding the consequences in the Local Board's letter. Shortly thereafter, he was given notice by the Local Board that they had received a letter from Universal Camera Corporation and that, in view of that letter, defendant would be continued in a deferred class. The letter from Universal Camera Corporation referred to by the Local Board stated that defendant had become an employee there and that the corporation was doing critical war work for the army and navy. When in April, 1944, defendant was placed in Class 1-A, he informed the board that he wished to appeal "because at that time (he) was employed by the Universal Camera Corporation, New York which was engaged 100% in National Defense work." He did not proceed with his appeal but he "assumed that the company had filed a deferment for (him)" (Statement in defendant's handwriting, Government's Exhibit 4). He was placed in Class 2-B without the necessity of an appeal, his own statement evidencing that he was fully aware that his employment with Universal Camera Corporation was the sole reason for his being so classified.

The letter of the physician upon the basis of which defendant claims he was given a "leave of absence" for ill health merely stated that the physician advised defendant to take a rest at his earliest convenience. Defendant's own estimate of the contemplated duration of the so-called "leave of absence" was that he had been told it might be for a week or two or a month. Even if it be assumed that defendant originally considered himself on a temporary leave from the company because of his alleged ill health, which is not the fact, continued absence from war work for a month or two without notifying his draft board, and certainly, as here, for six months convincingly indicates that he was in bad faith failing to perform a duty required of him. Nor is there any doubt that he knew that he should make such report. On December 26, 1944, defendant wrote a letter to his Local Board setting forth just the information required; his previous bad faith is reflected in the fact that this letter was written after the investigation had been commenced which lead to this prosecution and defendant had already been interrogated with respect thereto. Defendant's familiarity with the requirements of the law is also evidenced in his prompt notification of his Local Board in September, 1943 that he had procured employment with a Brooklyn concern engaged in essential war production, where he worked for four days before going to the Universal Camera Corporation.

However, serious doubt enshrouds the defendant's claim of ill health. While his work at Universal Camera Corporation paid him but 75¢ to $1 per hour and the highest weekly wages amounted to no more than $45, defendant's earnings for 1944 were approximately $18,000 (Government's Exhibit 4, page 5). During the time when he pretends to have been suffering ill health, defendant was advisory counsel and acted in other capacities for a toy manufacturing concern and also, until September 1944, was treasurer of Plywood Plastics Corporation, supervising all activities of the company, including purchasing, sales and production. It would appear that defendant's health well permitted him to

work in a war industry, if he chose this means of avoiding service in the armed forces, perhaps not in addition to but instead of the lucrative activities in which he was engaged. If he chose not to work in a war industry after he was disengaged from Universal Camera Corporation, he was under a duty to notify his Local Board that the essential employment which he formerly held, and upon the basis of which he had been placed in a deferred classification, had terminated.

The motion of defendant to dismiss the indictment is denied and defendant is found guilty under Count 2 in the indictment.